UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

UNITED STATES OF AMERICA       )
                               )
v.                             )       No. 2:18-CR-00155-JRG-CLC
                               )
PEDRO SILVESTRE-GREGORIO       )

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant's Motion to Dismiss, or Alternatively to Release Defendant on Pretrial Conditions of Release Pending a Final Decision [Doc. 20], the United States' Response [Doc. 21], Defendant's Supplemental Memorandum [Doc. 28], the United States' Response to Defendants' Supplemental Memorandum [Doc. 31], the United States' Post-Hearing Memorandum [Doc. 39], Defendants' Post-Hearing Memorandum [Doc. 40], and Defendant's Supplement to Post-Hearing Memorandum [Doc. 42]. For the reasons herein, the Court will deny Defendant's motion.

## I.  BACKGROUND

In 1996, Defendant Pedro Silvestre-Gregorio, at roughly the age of eleven, fled his native country of Guatemala for Mexico, to escape poverty and violence. [Hr'g Tr., Doc. 37, at 82:7–12; 83:16–25; 84:1–2].[1] As a native of Guatemala, he spoke "Chuj," [*id.* at 28:23–26], a regional dialect of northern Guatemala, [*id.* at 84:19–22]. According to Mr. Silvestre-Gregorio, most of the people in the area where he grew up in Guatemala spoke Chuj; few spoke Spanish. [*Id.* at 85:16–19]. After defecting to Mexico, where the locals spoke Spanish, he learned "a little bit of Spanish," [*id.* at 86:4–12], including "how to ask for food, how to call somebody, and

---

[1] Mr. Silvestre-Gregorio is also known as "Jesus Lopez-Abarca." [Criminal Compl, Doc. 1, at 1; Notice to Appear, Doc. 21-2, at 1]. According to Mr. Silvestre-Gregorio, "Jesus Lopez-Abarca" was a false identity that he assumed while living in Mexico. [Hr'g Tr. at 93:19–25; 94:1–11]. The parties agree that Pedro Silvestre-Gregorio and Jesus Lopez-Abarca are the same person. [*Id.* at 13:2–6].

how to say good morning." [*Id.* at 90:2–3]. He sold coffee and tortillas and cleaned windows to earn a living in Mexico, and none of these activities, he claims, required much communication in Spanish with others. [*Id.* at 85:20–25; 86:1; 87:21–24; 89:23–25; 90:1–3].

In February 2001, after spending four or five years in Mexico, he crossed the border into the United States, with the help of a boy from Mexico. [*Id.* at 85:20–21; 108:6–9; Arrest Warrant, Doc. 21-2, at 3]. After he entered the United States, federal agents apprehended him. [Hr'g Tr. at 88:9–11; 89:1–3; Arrest Warrant at 3]. He admittedly lied to these agents, telling them that he was from Mexico rather than Guatemala because he did not want them to send him back to Guatemala. [Hr'g Tr. at 88:9–25].

The United States Immigration and Naturalization Service (INS) initiated removal proceedings against Mr. Silvestre-Gregorio. [Notice to Appear, Doc. 21-2, at 1–2]. In a "Notice to Appear," INS alleged he was illegally present in the United States and ordered his appearance before an immigration judge in Houston, Texas. [*Id.* at 1]. The notice to appear has a section titled "Certificate of Service," which contains a fingerprint, a handwritten "X" affixed to a line labeled "Signature of Respondent if Personally Served," and a sentence stating that "the alien was provided oral notice in the Spanish language":



2

[*Id.* at 2].

INS also prepared a "Notice of Rights and Request for Disposition" [Doc. 21-3], which has the name "Lopez-Abarca, Jesus" at the head and states in part:

> **NOTICE OF RIGHTS**
>
> You have been arrested because immigration officers believe that you are illegally in the United States. You have the right to a hearing before the Immigration Court to determine whether you may remain in the United States. If you request a hearing, you may be detained in custody or you may be eligible to be released on bond, until your hearing date. In the alternative, you may request to return to your country as soon as possible, without a hearing.
>
> You have the right to contact an attorney or other legal representative to represent you at your hearing, or to answer any questions regarding your legal rights in the United States. Upon your request, the officer who gave you this notice will provide you with a list of legal organizations that may represent you for free or for a small fee. You have the right to communicate with the consular or diplomatic officers from your country. You may use a telephone to call a lawyer, other legal representative, or consular officer at any time prior to your departure from the United States.

[Notice of Rights at 2]. This notice also contains a section titled "Request for Disposition," which shows a handwritten "X" next to a box that states:

> I admit that I am in the United States illegally, and I believe I do not face harm if I return to my country. I give up my right to a hearing before the Immigration Court. I wish to return to my country as soon as arrangements can be made to effect my departure. I understand that I may be held in detention until my departure.

[*Id.* at 1]. Another handwritten "X" and the words "(Alien's Mark)" appear on a signature line below this paragraph. [*Id.*]. Lastly, the notice has a section titled "Certification of Service," and it bears an INS officer's signature and states the notice was "read to subject . . . in the Spanish language." [*Id.*].

Despite the handwritten "X" alongside the language dealing with the waiver of a hearing in this notice, Mr. Silvestre-Gregorio, in March 2001, appeared before an immigration judge in Houston, along with other respondents. [Immigration J. Order, Doc. 20-1, at 1; Audio: Removal Hr'g, Ex. 3, 4:04–09 (March 22, 2001)]. At the time, Mr. Silvestre-Gregorio was still a minor,

of the age of sixteen, [Hr'g Tr. at 82:7–8; Audio: Removal Hr'g at 2:06–21], and a representative from Associated Catholic Charities, Mr. Peter Stempien, was present with him, [Notice of Appearance, Doc. 21-6; Audio: Removal Hr'g at 0:36–1:00].[2] A Spanish-speaking interpreter was also present at the hearing and, throughout the hearing, he translated all the immigration judge's statements and questions from English to Spanish. [Audio: Removal Hr'g at 1:43–49].

The immigration judge began the hearing by asking Mr. Silvestre-Gregorio, through the interpreter, to state his name, and Mr. Silvestre-Gregorio stated his name. [*Id.* at 2:02–16]. The immigration judge next asked Mr. Silvestre-Gregorio for his age, and he stated his age. [*Id.* at 2:17–21]. The immigration judge then addressed all the respondents at once, explaining to them, through the interpreter, the nature of the proceedings, which he described as "removal proceedings." [*Id.* at 4:10–16]. He acknowledged that INS initiated the proceedings by filing a notice to appear for each respondent, and he noted that the interpreter had verified that each respondent received a notice to appear. [*Id.* at 4:17–39]. Next, he checked with Mr. Stempien to see if he received a copy of the notice to appear on Mr. Silvestre-Gregorio's behalf, [*id.* at 2:16–21], and he answered, "yes," [*id.* at 4:40–47].

From there, the immigration judge highlighted the importance of the notice to appear, pointing out to each respondent that it "contains all the reasons that the Immigration Service believes you are subject to removal." [*Id.* at 4:50–5:07]. He informed the respondents that the proceedings were "a way of removing a person from the United States," [*id.* at 5:48–57], and he summarized INS's charges against them in the notices to appear—namely INS's position that they were subject to removal because they are illegally present in the United States, [*id.* at

---

[2] Mr. Silvestre-Gregorio, having crossed the border into the United States without his parents, was in the custody of Catholic Charities in Houston. [Hr'g Tr. at 89:15–17; Audio: Removal Hr'g at 13:05–15; 22:36–49].

6:30–56]. He then asked Mr. Silvestre-Gregorio if he understood the nature of the proceedings as he described them to him. [*Id.* at 7:54–8:03]. His answer was "yes." [*Id.* at 8:04–05].

Next, the immigration judge explained the respondents' legal rights, including their right to present documents, evidence, and witnesses; their right to challenge any documents that INS introduced and used against them; their right to ask witnesses questions to ensure they were telling the truth; and their right to appeal a decision that they did not like. [*Id.* at 8:12–9:24]. He pointed out, specifically, that an "appeal" means an opportunity for them to have a higher court review his decisions "to make sure there is no mistake." [*Id.* at 9:24–34]. He then inquired as to whether Mr. Silvestre-Gregorio understood his legal rights as he described them to him, and Mr. Silvestre-Gregorio's response was "yes." [*Id.* at 9:36–52].

Lastly, the immigration judge explained the respondents' right to counsel; he informed them that they could have time to talk with an attorney or hire an attorney at little or no cost to them. [*Id.* at 9:56–10:58]. When he asked Mr. Silvestre-Gregorio whether he "understand[s] that he could have some time to look for an attorney if he wanted [one]," Mr. Silvestre-Gregorio's response was "yes." [*Id.* at 11:05–18]. He then asked Mr. Silvestre-Gregorio whether he would like more time to retain an attorney, and Mr. Silvestre-Gregorio paused for about eight seconds before declining the offer for more time, prompting the immigration judge to present follow-up questions to him:

> Immigration Judge: Jesus, do you want more time [to retain an attorney], or do you want to finish your case today?
>
> Mr. Silvestre-Gregorio: Yes.
>
> Immigration Judge: Does that mean you want more time or does that mean you want to finish today?
>
> Mr. Silvestre-Gregorio: . . .

> Immigration Judge: Do you understand the question?
>
> Mr. Silvestre-Gregorio: . . .
>
> Immigration Judge: Do you understand this interpreter?
>
> Mr. Silvestre-Gregorio: Yes.
>
> Immigration Judge: Okay. So the question is do you need some more time or . . . [unintelligible]?
>
> Mr. Silvestre-Gregorio: No.
>
> Immigration Judge: So you want to finish today?
>
> Mr. Silvestre-Gregorio: Yes.

[*Id.* at 11:32–12:24]. Several minutes later, after addressing some matters involving the other respondents, the immigration judge returned his focus to Mr. Silvestre-Gregorio, asking him if he had questions about anything he said up till now. [*Id.* at 18:24–33]. Mr. Silvestre-Gregorio responded by saying that he has no questions, and the immigration judge transitioned into a one on-one interaction with him. [*Id.* at 18:34].

The immigration judge asked Mr. Silvestre-Gregorio if he was prepared to represent himself. [*Id.* at 19:31–33]. When he responded, "yes," [*id.* at 19:34–36], the immigration judge placed him under oath: "Do you swear that any testimony you give will be the truth, the whole truth, and nothing but the truth, so help you God?" [*Id.* at 19:40–56]. Mr. Silvestre-Gregorio, however, did not provide the immigration judge with an immediate answer, prompting the immigration judge to say, "Jesus?" [*Id.* at 19:58–59]. Mr. Silvestre-Gregorio then offered his response to the oath, stating, "yes." [*Id.* at 20:00–02]. Raising a follow-up question, the immigration judge asked him if he understood "what it mean[t] to tell the truth," and his response was "yes." [*Id.* at 20:05–12]. The immigration judge then recited INS's allegations and

inquired as to whether Mr. Silvestre-Gregorio was a native and citizen of Mexico, and in response, he lied to the immigration judge, answering, "yes." [*Id.* at 20:15–51].

As the hearing proceeded, the immigration judge, through the interpreter, began to pose more open-ended questions to Mr. Silvestre-Gregorio—questions that required more than a yes or no answer—and Mr. Silvestre-Gregorio responded to them in Spanish:

Immigration Judge: Where were you born?

Mr. Silvestre-Gregorio: In Chiapas.

Immigration Judge: And that's in Mexico, is that correct?

Mr. Silvestre-Gregorio: Yes.

Immigration Judge: How did you cross the border, from Mexico into the United States?

Mr. Silvestre-Gregorio: Well, there was a young man who crossed me.

     . . . .

Immigration Judge: So did you cross the bridge, or did you go through water? How did you do it?

Mr. Silvestre-Gregorio: I crossed the river.

Immigration Judge: So it was away from the road or the bridge?

Mr. Silvestre-Gregorio: . . .

Immigration Judge: Does he understand the question?

Mr. Silvestre-Gregorio: Yes.

Immigration Judge: How long were you in the United States before you were caught?

Mr. Silvestre-Gregorio: Fifteen days.

Immigration Judge: And why were you caught?

Mr. Silvestre-Gregorio: One day, and they caught me over here in Houston.

Immigration Judge: You made it from the border to Houston in one day?

Mr. Silvestre-Gregorio: Yes.

Immigration Judge: How'd you do that?

Mr. Silvestre-Gregorio: Well, when [they] caught me, I had been here for one day.

. . . .

Immigration Judge: My question is, how did you get to Houston so quickly?

Mr. Silvestre-Gregorio: In a car.

[*Id.* at 22:20–24:36].

After this discussion, the immigration judge inquired about Mr. Silvestre-Gregorio's parents and family members. [*Id.* at 25:00–02]. Mr. Silvestre-Gregorio responded that he had no relatives in the United States and that his parents were in Chiapas. [*Id.* at 25:04–38]. He also informed the immigration judge that he had no reason to be fearful of returning to Mexico and that his parents could send him money so he could return there. [*Id.* at 25:40–26:13; 27:00–36]. But after consulting Mr. Stempien, the immigration judge advised Mr. Silvestre-Gregorio that neither Catholic Charities nor the Mexican Consulate had been able to locate his parents in Mexico. [*Id.* at 27:57–28:38]. He questioned how Mr. Silvestre-Gregorio could afford to return to Mexico without the ability to contact his parents or relatives in the United States who might provide him with financial assistance. [*Id.* at 28:42–56]. "Based on what you're telling me," the immigration judge said to him, "you don't appear to be eligible for any application." [*Id.* at 29:02–14]. He also said, "You can't contact your family to send you money, so you don't qualify for voluntary departure." [*Id.* at 29:58–30:16].

Concluding that Mr. Silvestre-Gregorio had no legal remedy to prevent his removal to Mexico, the immigration judge announced that he would issue an order of deportation. [*Id.* at 30:17–47]. He asked Mr. Silvestre-Gregorio, however, if he would like to appeal his order to a higher court. [*Id.* at 31:00–11]. Mr. Silvestre-Gregorio's answer was "no." [*Id.* at 31:12–15]. "So you want the government to send you back?" [*Id.* at 31:15–20]. "Yes," Mr. Silvestre-Gregorio responded. [*Id.* at 31:21–22]. The removal proceeding concluded, and the immigration judge issued a written deportation order. [Immigration J. Order at 1].

In 2018, roughly seventeen years later, federal immigration officials found and arrested Mr. Silvestre-Gregorio in the Eastern District of Tennessee, [Criminal Compl., Doc. 1, at 1–2; Executed Warrant, Doc. 7, at 1], where he was charged with illegal reentry, in violation of 8 U.S.C. § 1326(a), [Indictment, Doc. 8, at 1]. The United States Magistrate Judge appointed Federal Defender Services of East Tennessee (FDS) to represent him, [Order, Doc. 4, at 1], and FDS moved to dismiss the indictment, challenging the underlying administrative hearing—that is, the removal hearing in Houston—as fundamentally unfair. [Def.'s Mot. Dismiss at 1–11].

Specifically, FDS contends that the immigration judge's removal order is fundamentally unfair for three reasons. First, it argues that INS violated Mr. Silvestre-Gregorio's right to due process under the Fifth Amendment of the United States Constitution because it never served him with, or obtained his signature on, the notice to appear. [*Id.* at 3–6]. FDS asserts that he therefore was without valid notice of the removal hearing, and that, as a result, jurisdiction never vested with the immigration court. [*Id.*]. In addition, it also contends that the removal proceedings violated Mr. Silvestre-Gregorio's due process rights under the Fifth Amendment because he lacked "sufficient understanding of the Spanish language at the time to understand the interpreters in the courtroom." [Def.'s Suppl. Mem. at 9]. Second, FDS maintains that

the immigration judge did not advise Mr. Silvestre-Gregorio of his right to a form of relief known as "voluntary departure." [*Id.* at 7–8].[3] Third, FDS argues that Mr. Silvestre-Gregorio—particularly in light of his status as a minor—was entitled to legal representation throughout the removal hearing. [*Id.* at 8–9].

On April 2, 2019, the Court held an evidentiary hearing on Mr. Silvestre-Gregorio's motion to dismiss the indictment. [Minute Entry, Doc. 32]. The Court received testimony from multiple witnesses,[4] the first of whom was Sandra Jácome, a certified state court interpreter who has been translating English to Spanish for fifteen years and grew up in a Spanish-speaking home in Belize. [Hr'g Tr. at 4:4–13]. She appeared as Mr. Silvestre-Gregorio's witness and testified as a lay witness, not an expert witness. [*Id.* at 56:6–9]. Having listened to the audio recording from Mr. Silvestre-Gregorio's removal hearing in Houston, she offered her opinion, based on her knowledge and experience, that Mr. Silvestre-Gregorio likely did not understand the bulk of the interpreter's translations. [*Id.* at 20:5–25; 26:1].

According to Ms. Jácome, the interpreter gave a "very good interpretation" of the immigration judge, but he used five "false cognates," spoke in a "high register," and relayed the immigration judge's words to Mr. Silvestre-Gregorio at a "very fast" rate—all of which limited Mr. Silvestre Gregorio's ability to understand the proceedings. [*Id.* at 8:13–20; 19:14–25; 20:5–13; 32:19–23; 37:19–25; 38:1–7]. Ms. Jácome testified that she had to listen to the recording twice to understand completely the interpreter's translations and that a person who speaks a non-Spanish dialect or imperfect Spanish would have understood about thirty percent of it. [*Id.*

---

[3] FDS also originally argued that Mr. Silvestre-Gregorio "was not advised of his apparent relief under Special Immigrant Juvenile Status," [Def.'s Mot. Dismiss at 7], but it has now withdrawn this argument, *see* [Def.'s Post-Hr'g Mem. at 2 ("Mr. Silvestre-Gregorio concedes that based on a lack of proof available and the conflicting testimony as to the timing of his father's death, he cannot proceed on the claim based on Special Immigrant Juvenile Status.")].

[4] Before hearing testimony from any witnesses, the Court allowed FDS to play the entire audio recording of the removal hearing, which, again, dated back to 2001 in Houston. [Hr'g Tr. at 3:14–20].

at 20:5–25; 26:1; 75:13–14]. She also testified that a college graduate in "a Latin American country who is not involved in the legal system" would have been unable to understand "a lot of the terminology used in that, in that recording." [*Id.* at 11:11–13].

As support for her testimony, she highlighted certain pauses in Mr. Silvestre-Gregorio's responses to the interpreter's translations, and she testified that these pauses demonstrate that he likely did not fully understand these translations. [*Id.* at 14:20–25; 15:1–14; 15:24–25; 16:1–25; 17:1–6; 24:17–25]. For example, Ms. Jácome stated that Mr. Silvestre-Gregorio's eight-second pause—in response the immigration' judge's question of whether he wanted additional time to retain an attorney—meant that he did not understand whether to say yes or no. [*Id.* at 16:12–25; 17:1–6]. But Ms. Jácome agreed that a pause leading up to a person's answer to a question can potentially mean "a lot of things" and is not always indicative of a lack of understanding on that person's part. [*Id.* at 59:17–19]. She conceded that this type of pause could mean the person is thinking or considering the answer that is in his best interest. [*Id.* at 59:20–25; 60:1–4]. Also, she recognized that pauses did not precede all of Mr. Silvestre-Gregorio's answers and that some of his answers were "confident." [*Id.* at 21:5–9].

Still, she believed that in this case—because of the interpreter's use of false cognates, a high register, and a fast rate of speech—Mr. Silvestre-Gregorio's pauses were "highly likely" a manifestation of his inability to understand the interpreter. [*Id.* at 60:13–19]. Specifically, she maintained that Mr. Silvestre-Gregorio did not understand his right to reserve additional time to retain an attorney because "he never gave an answer to that particular question." [*Id.* at 77:18–21]. She also testified that she did not believe that Mr. Silvestre-Gregorio understood his right to pursue voluntary departure because "voluntary departure is higher register in Spanish." [*Id.* at

76:21–25; 77:1]. She was unable to form any opinion, however, as to whether he understood the nature of the proceedings or his right to appeal. [*Id.* at 74:22–25; 75:1–2; 76:13–20].

After Ms. Jácome's testimony, Mr. Silvestre-Gregorio testified. When FDS showed him the notice to appear and the notice of rights—the documents that INS prepared before his removal hearing in Houston—he did not recognize them and did not recall whether someone had explained or read them to him leading up to his removal hearing, though he acknowledged that "it is possible" that someone did. [*Id.* at 91:7–8; 91:13–19; 105:21–25; 106:23–25; 107:1–2; 107:11–16; 124:7–12]. He also did not remember signing the documents and said that the "X" that appears in each signature block is not his own. [*Id.* at 93:8–13]. He stated that he signs documents with his own signature—with the name Jesus Lopez-Abarca—and not with an "X." [*Id.* at 93:14–24].

As for his testimony about his ability to understand the interpreter at the removal hearing, he stated that his primary language at that time was Chuj and he did not "speak much" Spanish. [*Id.* at 89:18–24].[5] Although he initially testified that he did not understand any of the interpreter's questions and statements, he went on to recant this testimony—with the help of a leading question or two from FDS—and maintained that he understood some but not all of the interpreter's questions:

> Q: And did you understand some of what the interpreter said?
>
> A: Honestly, no.
>
> Q: Well, you answered some of the questions. Could you hear the [audio of the] hearing very well today that we listened to?

---

[5] Mr. Silvestre-Gregorio acknowledged that he picked up basic Spanish during the four or five years in which he lived in Mexico, but he claimed that he received his first "lessons" in Spanish when he arrived at Catholic Charities in Houston. [*Id.* at 89:25; 90:1–12].

A: Yes, yes, I was able to listen to it.

Q: Okay. So like when they asked you where you were from, you said Mexico?

A: Uh-huh.

Q: Do you remember that?

A: Yes.

Q: They asked you a few other questions such as how you entered the United States?

A: Uh-huh, yes, yes.

Q: And today when we listened to that, you, you heard yourself answering that question, right?

A: Yes.

Q: Okay. So there were things in the hearing that you did understand maybe and there were things that you didn't understand. Is that right?

A: Yes.

[*Id.* at 96:14–25; 97:1–9].[6]

Along similar lines, Mr. Silvestre-Gregorio initially testified that he understood that the proceeding in Houston was a removal proceeding, but he later testified that he did not understand the purpose of the proceeding at all:

Q: So you were hoping that if you were going to be deported, it would be to Mexico?

A: Yes, that was my hope[.]

Q: Did you understand that you were in this hearing because they were trying to deport you?

---

[6] Mr. Silvestre-Gregorio testified that he became able to speak and understand Spanish "a little bit well" while living in the United States over the past seventeen or eighteen years, during which he picked up the language from friends. [*Id.* at 101:9–25; 102:12–15].

A: Mm-hmm.

     . . . .

Q: We've established that you answered some questions at the hearing in a reasonable way in Spanish, but in general did you have any idea what was really going on at that hearing?

A: No, no, I didn't understand at all.

Q; Did you understand why those questions were being asked of you?

A: No.

[*Id.* at 94:12–18; 103:10–16]. In addition, Mr. Silvestre-Gregorio testified that he did not understand the immigration judge's explanation of his right to counsel, his right to challenge the allegations against him, or his right to request certain forms of relief that might have then been available to him. [*Id.* at 94:22–25; 95:1–5; 103:3–6]. Although he could not recall whether he understood his right to request voluntary departure, he said that if he had been aware of this type of relief, he would have pursued it because he wanted to remain in the United States. [*Id.* at 95:25; 96:1–2; 102:16–21].

On cross examination, he insisted, however, that he recalled few if any details about the removal hearing, stating, "I don't remember anything anymore." [*Id.* at 105:14]. On redirect, he reiterated his inability to remember any particulars relating to the removal hearing, declaring that "[h]onestly everything related to 2001, I don't remember any of it" and that "I just don't remember anything." [*Id.* at 105:14; 123:1–2; 124:11–12]. He also repeated that he could not remember whether INS or anyone else explained or read the notice to appear or the notice of rights to him: "I don't remember any of that." [*Id.* at 124:6].

Following Mr. Silvestre-Gregorio's testimony, FDS called his fifteen-year-old daughter, Magdalena Silvestre Carmello, who speaks Chuj, English, and Spanish. [*Id.* at 128:12–15]. She

testified that Chuj is somewhat similar to Spanish but some words do not always translate well between the two languages. [*Id.* at 130:24–25; 131:1–6]. She also testified that her parents habitually spoke Chuj as she was growing up but taught her Spanish before she entered kindergarten. [*Id.* at 130:10–14; 132:7–13; 134:3–5; 137:8–11; 137:15–18]. She noted that, at that time, her father was primarily responsible for teaching her Spanish, though, in her opinion, his fluency "wasn't very great." [*Id.* at 137:19–20; 138:2–10]. Still, he taught her well enough not only to carry on a conversation but also to read Spanish. [*Id.* at 137:21–25; 138:6–10].

After Magdalena's testimony, FDS called its final witness, Mr. Stempien, who was a licensed social worker with Catholic Charities' Houston-based foster care program in 2001 and transported juveniles in that program to removal hearings. [*Id.* at 143:7–18; 144:19–20]. He testified that the program housed around twenty children at any one time, and in his role as a licensed social worker, he would typically see each child once a week, though he and the staff held daily meetings that also involved interaction with the children. [*Id.* at 148:19–24; 165:11–16; 165:21–25; 166:1–6]. Although Mr. Stempien—who himself spoke some Spanish in 2001—recalled working with children whose first language was not Spanish, including children whose native country was Guatemala, he stated that these children were proficient enough in Spanish to understand his communications with them in Spanish. [*Id.* at 156:3–17].

Along these same lines, he said that he could not recall an instance when he was unable to interact with a child in Spanish or when he felt compelled to notify INS that a child was unable to speak or understand Spanish. [*Id.* at 156:18–21; 158:22–25; 159:1–3]. In addition, he testified that, during his attendance at various removal hearings over the years, he could not remember an instance when he felt that miscommunication or confusion existed between an interpreter and a child—and if he had sensed miscommunication or confusion, he would have

interrupted the immigration judge to alert him. [*Id.* at 161:18–25; 162:1–11].[7] Although he was unable specifically to recall Mr. Silvestre-Gregorio or his hearing from 2001, he testified that he likely would have interrupted any hearing if he had ever detected confusion arising from an immigration judge's need to repeat a question to a child or from a child's hesitation before responding to a question. [*Id.* at 143:3–6; 163:4–15]. He also was unable to recall a situation in which a child, on the ride back to a Catholic Charities after a hearing, told him that he did not understand the immigration judge or the interpreter—and he stated that if this situation had arisen, he would have notified his supervisor. [*Id.* at 162:12–22].

The United States called no witnesses, and at the hearing's conclusion, the parties chose to file post-hearing memoranda at a later date rather than present closing arguments. The Court has received and carefully reviewed these memoranda, the memoranda that the parties filed with the Court before the hearing, and the evidence from the hearing. The Court is now prepared to rule on Mr. Silvestre-Gregorio's motion to dismiss the United States' indictment.

## II.  DUE PROCESS AND NONCITIZENS

The Due Process Clause states that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. The phrase "due process of law" means "many different things in the numerous contexts in which it applies," *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 590 (1972) (citations omitted), but at its nub, it is a constitutional guarantee that prohibits the government from depriving persons of life, liberty, or property without appropriate safeguards, *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985). Under the Due Process Clause, a person's right to due process is twofold, consisting of "categories of substance and procedure," each of which is "distinct." *Id.*

---

[7] According to Mr. Stempien, he was fluent enough in Spanish to understand communications between the interpreters and the children when he attended removal hearings. [*Id.* at 161:7–10].

Substantive due process concerns whether the government has a sufficient purpose to justify the deprivation of a person's substantive rights—namely life, liberty, and property. *Id.* Procedural due process, on the other hand, is the requirement that the government must follow constitutionally adequate procedures before it deprives persons of these substantive rights. *See Mathews v. Eldridge*, 424 U.S. 319, 332 (1976) (stating that "[p]rocedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause"). For example, as to procedural due process, "[a]n elementary and fundamental requirement . . . is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 13 (1978) (quoting *Mullane v. Cent. Hanover Tr. Co.*, 339 U.S. 306, 314 (1950)); *see Fuentes v. Shevin*, 407 U.S. 67, 80 (1972) ("For more than a century the central meaning of procedural due process has been clear: 'Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified.'" (quotation omitted)).

"[T]he Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) (citations omitted); *see Reno v. Flores*, 507 U.S. 292, 306 (1993) ("It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings." (citation omitted)); *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953) ("[A]liens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in

due process of law."). For an alien,[8] due process requires (1) fair notice of the charges against him, (2) a hearing before an executive or administrative tribunal, and (3) a fair opportunity to be heard. *Sessions v. Dimaya*, 138 S. Ct. 1204, 1231 n.3 (2018) (Gorsuch, concurring in part and concurring in the judgment); *The Japanese Immigrant Case*, 189 U.S. 86, 101 (1903).

### III.  ANALYSIS

To convict a defendant of illegal reentry in violation of 8 U.S.C. § 1326(a), the United States must prove four elements: (1) that the defendant was previously removed from the United States, (2) that he knowingly re-entered the United States, (3) that he was found in the United States without the Attorney General's express consent, and (4) that he was an alien when he re-entered the United States. 8 U.S.C. § 1326(a); *United States v. Hodulik*, 44 F. App'x 656, 660 (6th Cir. 2002). Although federal courts ordinarily "cannot consider a factual challenge to an indictment purporting to show a defect consisting solely of insufficient evidence to prove" the elements of a criminal charge, *United States v. Jones*, No. 1:05-CR-132, 2006 WL 399234, at *1 (E.D. Tenn. Feb. 16, 2006), an alien charged with illegal reentry under § 1326(a) has a Fifth Amendment right, post-indictment, to collaterally attack an immigration judge's underlying removal order, 8 U.S.C. § 1326(d); *see United States v. Ubaldo-Figueroa*, 364 F.3d 1042, 1047–48 (9th Cir. 2004) ("A defendant charged with illegal reentry under 8 U.S.C. § 1326 has a Fifth Amendment right to collaterally attack his removal order because the removal order serves as a predicate element of his conviction." (citing *United States v. Mendoza-Lopez*, 481 U.S. 828, 837–38 (1987))).

---

[8] Throughout this opinion, the Court uses the term "alien" to refer to any person who is not a citizen or national of the United States. 8 U.S.C. § 1101(a)(3).

Through this right to collaterally attack a removal order—a right that Congress codified in 8 U.S.C. § 1326(d)—an alien can effectively raise a factual challenge to the first element necessary for conviction under § 1326(a), the element requiring a previous order of removal. In this context—the context of an alien's collateral attack of a removal order—courts can and do consider motions to dismiss indictments that necessarily amount to more than mere facial challenges to the indictments' sufficiency. *United States v. Estrada*, 876 F.3d 885, 886 (6th Cir. 2017); *United States v. Lopez-Collazo*, 824 F.3d 453, 456 (4th Cir. 2016); *Ubaldo-Figueroa*, 364 F.3d at 1047. Indeed, these types of challenges to indictments require courts to carry out a meaningful review of the removal proceeding. *See United States v. Mendoza-Lopez*, 481 U.S. 828, 837–39 (1987) ("[W]here a determination made in an administrative proceeding is to play a critical role in the subsequent imposition of a criminal sanction, there must be *some* meaningful review of the administrative proceeding. . . . before the administrative order may be used to establish conclusively an element of . . . . unlawful entry after a deportation." (citations and footnotes omitted)).

To succeed in a collateral attack of a removal order under § 1326(d), an alien has to show that "(1) [he] exhausted any administrative remedies that may have been available to seek relief against the order; (2) the deportation proceedings at which the order was issued improperly deprived [him] of the opportunity for judicial review; and (3) the entry of the order was fundamentally unfair." *Estrada*, 876 F.3d at 887 (quoting 8 U.S.C. §1326(d)). "[I]f the defendant satisfies all three requirements, the illegal reentry charge must be dismissed as a matter of law." *United States v. El Shami*, 434 F.3d 659, 663 (4th Cir. 2005) (citation omitted); *see Mendoza-Lopez*, 81 U.S. at 840 (stating that when an alien succeeds on a collateral attack

under § 1326(d), the United States cannot rely on an immigration judge's deportation order "as reliable proof of an element of a criminal offense").

In this circuit, the burden of meeting § 1326(d)'s elements unquestionably rests with the movant. *See Estrada*, 876 F.3d at 887 ("Because the requirements are conjunctive, *the alien must satisfy all three prongs.*" (emphasis added)); *United States v. Martinez-Rocha*, 337 F.3d 566, 569–71 (6th Cir. 2003) (considering the alien's evidence that his waiver of his right to challenge his deportation order was not intelligent); *Huicochea-Gomez v. INS*, 237 F.3d 696, 699 (6th Cir. 2001) ("The alien carries the burden of establishing that ineffective assistance of counsel prejudiced him or denied him fundamental fairness in order to prove that he has suffered a denial of due process." (citation omitted)); *see also United States v. Barba*, No. 3:08-CR-46, 2009 WL 1586793, at *4 (E.D. Tenn. June 3, 2009) (mentioning the alien's "burden of demonstrating that each of the criteria contained in 18 U.S.C. § 1326(d) has been met"). But to this Court's knowledge, no court in this circuit has identified the precise evidentiary standard that an alien has to satisfy to dispatch his burden under § 1326(d), and neither Mr. Silvestre-Gregorio nor the United States exhorts or even asks the Court to apply any particular evidentiary standard.

Outside this circuit, courts generally appear to agree that the appropriate evidentiary standard under § 1326(d) is a preponderance of the evidence standard. *See United States v. Martinez-Amaya*, 67 F.3d 678, 682 n.5 (8th Cir. 1995) (declaring that "the application of a 'preponderance of the evidence' standard of proof to an alien's collateral attack upon a prior deportation seems appropriate to us, in light of the fact that a deportation proceeding is civil in nature") (citing *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1038 (1984))); *see also Richardson v. United States*, 558 F.3d 216, 222 n.5 (3d Cir. 2009) ("Given the civil nature of deportation

proceedings, an alien seeking to demonstrate the invalidity of a written waiver [at a deportation proceeding] will be held to a 'preponderance of the evidence' standard." (citing *id.*)); *United States v. Reyes-Romero*, 364 F. Supp. 3d 494, 504 n.11 (W.D. Pa. 2019) (noting that an alien must establish the third element under § 1326(d)—the element of fundamental unfairness—by a preponderance of the evidence); *United States v. Galcia*, No. 1:15CR59, 2016 WL 4054926, at *2 (E.D. Va. July 26, 2016) ("[T]he Defendant must meet his burden under § 1326(d) by a preponderance of the evidence." (citations omitted)).[9]

In addition, the Supreme Court has stated that "[a] deportation proceeding is a purely civil action," *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1038 (1984) (citations omitted)—a statement that suggests courts should evaluate deportation proceedings through the prism of a preponderance of the evidence standard, *see Desert Palace, Inc. v. Costa*, 539 U.S. 90, 91 (2003) (observing that the requirement that a plaintiff must prove his case by a preponderance of the evidence is "the conventional rule of civil litigation"). And although Mr. Silvestre-Gregorio's collateral attack on the immigration judge's removal order arises before this Court in the context of a criminal proceeding, *see Mendoza-Lopez*, 468 U.S. at 839 n.17 ("[T]he collateral challenge we recognize today is available only in criminal proceedings instituted after reentry."), a preponderance of the evidence standard is not foreign to matters arising in criminal proceedings, *see United States v. Gates*, 461 F.3d 703, 708 (6th Cir. 2006) ("[J]udicial fact-finding in sentencing proceedings using a preponderance of the evidence standard post-*Booker* does not

---

[9] The Ninth Circuit Court of Appeals has adopted the view that "[w]hen a removal proceeding in which the noncitizen appeared *pro se* is challenged through a § 1326(d) motion, the government bears the burden of proving the validity of the waiver of the right to counsel 'by clear and convincing evidence.'" *United States v. Morelos-Navarro*, 742 F. App'x 226, 228 (9th Cir. 2018) (quoting *United States v. Gomez*, 757 F.3d 885, 893–94 (9th Cir. 2014)). But Mr. Silvestre-Gregorio does not cite this Ninth Circuit case or expressly argue that the burden rests on the United States. The Third Circuit Court of Appeals, incidentally, has convincingly rejected the Ninth Circuit's view, *Richardson*, 558 F.3d at 221–22, and besides, FDS concedes that Mr. Silvestre-Gregorio had no right to counsel during his removal hearing, [Def.'s Post-Hr'g Mem. at 13].

violate either Fifth Amendment due process rights, or the Sixth Amendment right to trial by jury."); *United States v. Jabara*, 644 F.2d 574, 576 n.1 (6th Cir. 1981) ("The burden was placed on the defendant-appellant to prove by a preponderance of the evidence that he was prosecuted twice for the same offense." (citation omitted)). The Court will therefore hold Mr. Silvestre-Gregorio to the burden of proving § 1326(d)'s elements by a preponderance of the evidence.

## A. Jurisdiction

FDS's first argument—its argument that jurisdiction never originally vested in the immigration court because INS's notice to appear was legally defective—presents a potentially threshold issue as to whether this Court can consider the collateral attack under § 1326(d) if the immigration court, in the first instance, lacked jurisdiction to enter a deportation order. *See* [Def.'s Mot. Dismiss at 6 (arguing that "deficient notice, via the [notice to appear], results in jurisdiction never having vested with the [immigration court]")]. FDS is not the first party to conceive this argument on a collateral attack under § 1326(d). *See United States v. Zapata-Cortinas*, 351 F. Supp. 3d 1006, 1018 (W.D. Tex. 2018) ("[A]ccording to Defendant, jurisdiction did not vest in the immigration court because no *valid* charging document was filed in this case. Because orders exceeding a court's jurisdiction may be void, Defendant contends that § 1326(d) need not necessarily be satisfied in order to collaterally attack the prior Removal Order." (citations omitted)).

To support this argument, FDS relies on federal immigration regulations, specifically 8 C.F.R. § 1003.14(a), which states:

> Jurisdiction vests, and proceedings before an Immigration Judge commence, when a charging document is filed with the Immigration Court by the Service. The charging document must include a certificate showing service on the opposing party pursuant to § 1003.32 which indicates the Immigration Court in which the charging document is filed.

Section 1003.32(a), in turn, states that a charging document must be "served by the presenting party on the opposing party or parties," either "in person or by first class mail to the most recent address contained in the Record of Proceeding," and that "[a] certification showing service on the opposing party" is necessary. A notice to appear—which is the relevant charging document here in Mr. Silvestre-Gregorio's case—is one type of charging document. *Id.* § 1003.13.

Similarly, the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), 110 Stat. 3009-546, contains notice requirements that INS must adhere to when it initiates removal proceedings against an alien. Specifically, under 8 U.S.C. § 1229(a)(1) of the IIRIRA, "written notice (in this section referred to as a 'notice to appear') shall be given in person to the alien," unless personal service is not practical. This notice to appear must contain an explanation of the proceedings against the alien, including:

(A) The nature of the proceedings against the alien.

(B) The legal authority under which the proceedings are conducted.

(C) The acts or conduct alleged to be in violation of law.

(D) The charges against the alien and the statutory provisions alleged to have been violated.

(E) The alien may be represented by counsel and the alien will be provided (i) a period of time to secure counsel under subsection (b)(1) and (ii) a current list of counsel prepared under subsection (b)(2).

(F)(i) The requirement that the alien must immediately provide (or have provided) the Attorney General with a written record of an address and telephone number (if any) at which the alien may be contacted respecting proceedings under section 1229a of this title. (ii) The requirement that the alien must provide the Attorney General immediately with a written record of any change of the alien's address or telephone number. (iii) The consequences under section 1229a(b)(5) of this title

of failure to provide address and telephone information pursuant to this subparagraph.

(G)(i) The time and place at which the proceedings will be held. (ii) The consequences under section 1229a(b)(5) of this title of the failure, except under exceptional circumstances, to appear at such proceedings.

8 U.S.C. § 1229(a)(1).

When a charging document does not comport with the IIRIRA or federal immigration regulations, some courts have concluded, or at least intimated, that an immigration court does not have jurisdiction to enter a deportation order and a district court, on collateral review, therefore has no need to perform an analysis under § 1326(d). *See United States v. Ortiz*, 347 F. Supp. 3d 402, 407 (D.N.D. 2018) (granting an alien's motion to dismiss the indictment after determining that a defective notice to appear meant that "Defendant need not satisfy section 1326(d)'s strict requirements because the Immigration Judge lacked jurisdiction from the outset"); *see generally Hernandez-Perez v. Whitaker*, 911 F.3d 305, 310 (6th Cir. 2018) (considering the question of whether a notice to appear was defective and treating this question as "a jurisdictional objection that must be resolved before considering the merits"); *Puc-Ruiz v. Holder*, 629 F.3d 771, 782 (8th Cir. 2010) ("When the [immigration court] lacks jurisdiction, [its] decision are nullities." (citation omitted)); *Shogunle v. Holder*, 336 F. App'x 322, 324–25 (4th Cir. 2009) ("Because the immigration court did not yet have jurisdiction, it could not order [the petitioner] to do anything."); *Lazaro v. Mukasey*, 527 F.3d 977, 980 (9th Cir. 2008) ("A petitioner is entitled to relief from a defective [notice to appear] if he 'show[s] that the Immigration Court lacked jurisdiction.'" (quotation omitted)); *United States v. Mendez-Morales*, 384 F.3d 927, 930 (8th Cir. 2004) (noting that the Supreme Court has "held that an order could

be collaterally attacked *if* the board acted beyond its jurisdiction" (citing *Estep v. United States*, 327 U.S. 114, 122–23 (1946))).

Other courts, however, have concluded that a defective notice to appear in a removal proceeding does not obviate the need for district courts to conduct an analysis under § 1326(d). *See United States v. Gomez-Ramirez*, 365 F. Supp. 3d 226, 231–32 (D. Mass. 2019) ("Regardless of whether the immigration court had jurisdiction over Gomez-Ramirez's removal proceedings, he must make the required showing under 8 U.S.C. § 1326(d) to collaterally attack his removal order" (citations omitted)); *Zapata-Cortinas*, 351 F. Supp. 3d at 1021–22 ("[T]he legislative history and plain language of § 1326 and relevant Fifth Circuit precedent demonstrate that Defendant is not *automatically* permitted to collaterally attack his Removal Order for want of jurisdiction. Instead, Defendant may only collaterally attack his Removal Order if he can satisfy the elements of § 1326(d)."); *see also* 8 U.S.C. § 1326(d) (stating that "an alien *may not* challenge the validity of the deportation order . . . *unless* the alien demonstrates that" he has satisfied all three statutory requirements).

But the Court has no need to contemplate whether a defective notice of an immigration hearing strips federal courts of jurisdiction under § 1326(d) because Mr. Silvestre-Gregorio has not shown by a preponderance of the evidence that the notice to appear was defective. FDS makes a threefold argument to support its contention that the notice to appear was defective and that, as a result, "the [immigration court] never had jurisdiction," claiming (1) "Ms. [sic] Silvestre-Gregorio did not sign the document," (2) "no one ever explained the document to him," and (3) "his guardians were not given notice." [Def.'s Mot. Dismiss at 6]. Each of these arguments lacks merit.

*1. The Handwritten "X"*

The gestalt of FDS's first argument appears to be that the absence of a signature on a notice to appear makes it defective. In considering this argument, the Court starts by noting the predominate theme of Mr. Silvestre-Gregorio's testimony: he could recall little if anything of his removal hearing or the events that led to it more than eighteen years ago. *See* [Hr'g Tr. at 123:1–2 ("Honestly everything related to 2001, I don't remember any of it.")]. In particular, he testified that he did not recognize the notice to appear, yet despite his inability to recognize it, he felt comfortable testifying—straining his own credibility in the process—that he did not put the "X" on it. [Hr'g Tr. at 91:7–8; 93:8–13; 93:14–24]. Even if the Court were to accept his testimony that he did not sign the notice to appear—despite his admission that he did not even recognize this document—it would be unconvinced that the notice is defective without proof that the fingerprint on the notice does not belong to him.

Again, the IIRIRI states that a notice to appear must "be given in person to the alien" unless personal service is not practical, 8 U.S.C. § 1229(a)(1), and 8 C.F.R. § 1003.32(a), likewise, states that a notice to appear must be "served by the presenting party on the opposing party or parties," either "in person or by first class mail." As proof of service, § 1003.32(a) requires "[a] certification showing service on the opposing party," though it is silent regarding the contents of this certification. *Compare* 8 C.F.R. § 1003.32(a) (stating that the certification must "show[]" proof that service occurred in person, without specifying a particular type of proof), *with* Fed. R. Civ. P. 4(*l*) (requiring a "server's affidavit" as proof of service). FDS does not argue, however, that § 1003.32(a)'s silence renders it ambiguous, leaving the Court to presume that FDS accepts the regulation's plain meaning. *See generally Hernandez-Perez*, 911 F.3d at 313 ("'[R]esort to [agency] deference' is unnecessary because the statutory and

regulatory text 'suppl[y] a clear and unambiguous answer to the interpretative question at hand." (quoting *Pereira v. Sessions*, 138 S. Ct. 2105, 2113 (2018))); *Baptist Physician Hosp. Org., Inc. v. Humana Military Healthcare Servs., Inc.*, 481 F.3d 337, 344 (6th Cir. 2007) ("As with all matters of regulatory interpretation, we look first to the plain and unambiguous meaning of the regulation, if any." (citations omitted)).

"The term 'personal service' has a well defined meaning, and is generally defined to mean what the words import, namely, notice personally given, and where written notice is required, it would ordinarily mean that the written notice must be served personally upon the one entitled to it." *Merrion v. Scorup-Sommerville Cattle Co.*, 134 F.2d 473, 476 (10th Cir. 1943); *see Personal Service*, *Black's Law Dictionary* (10th ed. 2014) (stating that "personal service" is "[a]ctual delivery of the notice or process to the person to whom it is directed"). The placement of a party's fingerprint on a notice to appear is unquestionably one way to show that hand-to-hand delivery took place between the server and that party, satisfying the regulatory requirement that a notice to appear must "show[] service [occurred] on the opposing party" in person. 8 C.F.R. § 1003.14(a); *see* 8 U.S.C. § 1229(a)(1); 8 C.F.R. § 1003.32(a).

Mr. Silvestre-Gregorio has not even challenged the identity of the fingerprint on the notice to appear, let alone offered a preponderance of evidence showing that it does not belong to him. Without this evidence, the Court is unable to conclude that any uncertainty as to the handwritten "X" alone—especially in light of Mr. Silvestre-Gregorio's inability to recognize the document on which it appears—is enough to illustrate by a preponderance of the evidence that he did not receive personal service. *Cf. Fall v. Holder*, 560 F. App'x 519, 521 (6th Cir. 2014) (observing that, under the IIRIRI, evidence of proof of service upon an alien "by regular

mail," let alone evidence of proof of service in person, "creates a rebuttable presumption that the alien in fact received notice" (citation omitted)).

### 2. *Explanation of the Notice to Appear*

FDS's second argument that "no one ever explained the document to" Mr. Silvestre-Gregorio lacks support from a preponderance of evidence, too. Mr. Silvestre-Gregorio's testimony on this front was entirely equivocal. He simply was unable to recall whether someone had or had not explained or read the notice to appear to him, and in fact, he conceded that "it is possible" someone did do so. [Hr'g Tr. at 91:7–8; 91:13–19; 105:21–25; 106:23–25; 107:1–2; 124:7–12]. He cannot surmount his evidentiary burden with this noncommittal testimony. *Cf. Wysong v. City of Heath*, 260 F. App'x 848, 858 (6th Cir. 2008) ("[The plaintiff] admits that he cannot remember the events . . . . [He] cannot beat something with nothing."); *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004) ("[T]he non-moving party must be able to show 'sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy.'" (quotation omitted)); *Smith v. LVNV Funding, LLC*, No. 2:11-CV-356, 2014 WL 4441195, at *1 n.1 (E.D. Tenn. Sept. 9, 2014) (noting that "testimony that the plaintiff does not remember" whether an event took place "does not amount to [a] sufficient denial[] to create a genuine issue of fact").

### 3. *Service of Notice on Mr. Silvestre-Gregorio's Guardian*

Lastly, FDS argues that the United States has not established "that Mr. Silvestre-Gregorio's legal guardians at the time (presumably Catholic Charities) was served with the

[notice to appear].” [Def.’s Mot. Dismiss at 5].[10] As support for this argument, it cites 8 C.F.R.

§ 103.8(c)(2)(iii), which states that “in the case of a minor under 14 years of age, service shall

be made upon the person with whom the incompetent or the minor resides.” [*Id.* (quoting 8

C.F.R. § 103.8(c)(2)(ii))]. Although FDS acknowledges that Mr. Silvestre-Gregorio was more

than fourteen years of age when his removal hearing occurred in 2001, it implores the Court to

look past this fact because “the intent of the regulation was to promote more care when

proceeding with the removal of a juvenile.” [Def.’s Post-Hr’g Mem. at 9].

FDS offers the Court no authority to support its characterization of “the intent of the

regulation,” [*id.*], and even if the Court were to defy this regulation’s plain terms by applying

it to minors over age fourteen, FDS’s argument would still fail. In the audio recording of the

removal hearing from 2001—which the United States filed in the record, [Notice of Filing of

DVD, Doc. 31-1]—Mr. Stempien confirmed that he had in fact received a notice to appear

relating to Mr. Silvestre-Gregorio:

> Immigration Judge: Mr. Peter Stempien is here with the two juveniles . . . to the
> respondent Mr. Jesus Lopez.
>
>     . . . .
>
> Immigration Judge: The court interpreter has verified that each of you have [sic]
> received this notice to appear. Mr. Stempien, you have a copy of this for each of
> your charges?
>
> Mr. Stempien: Yes, Your Honor.

[Audio: Removal Hr’g at 1:52–2:00; 4:30–47]. FDS makes no attempt to confront or counter

the evidence from this recording—specifically Mr. Stempien’s statement that Catholic Charities,

---

[10] With this argument, FDS misapprehends the burden of proof. The United States does not have the burden
to establish anything. Again, the burden rests on Mr. Silvestre-Gregorio to collaterally attack the United States’
indictment, by a preponderance of the evidence.

the guardian "with whom . . . the minor reside[d]" at that time, received a notice to appear on Mr. Silvestre-Gregorio's behalf. 8 C.F.R. § 103.8(c)(2)(iii). FDS therefore falls well short of buttressing its argument with a preponderance of evidence.

## B. Collateral Attack

Having determined that the notice to appear is not defective and that, as a result, the immigration judge's removal order is free of jurisdictional maladies, the Court will address the merits of Mr. Silvestre-Gregorio's collateral attack. Again, to succeed in a collateral attack of a removal order under § 1326(d), an alien has to show that "(1) [he] exhausted any administrative remedies that may have been available to seek relief against the order; (2) the deportation proceedings at which the order was issued improperly deprived [him] of the opportunity for judicial review; and (3) the entry of the order was fundamentally unfair." *Estrada*, 876 F.3d at 887 (quoting 8 U.S.C. § 1326(d)). "[T]he alien must satisfy all three prongs." *Id.* In performing an analysis under these elements, a court does not have to address them sequentially; no one element is an antecedent to the other. *Id.* at 887–89 (denying the defendant's motion to dismiss the indictment under § 1326(d) based on an analysis under the third element alone).

Under § 1326(d), FDS bases its collateral attack almost exclusively on the third element, maintaining that "Mr. Silvestre-Gregorio's removal order was fundamentally unfair for several reasons," but also argues, as to the first element, that Mr. Silvestre-Gregorio "is not required to have exhausted administrative remedies." [Def.'s Mot. Dismiss at 3, 9].[11] To prove that the entry of the removal order is fundamentally unfair, Mr. Silvestre-Gregorio has to muster evidence demonstrating that (1) a due process violation occurred during the removal hearing and (2) this

---

[11] Mr. Silvestre-Gregorio cites Ninth Circuit and Fourth Circuit case law for this proposition, [Def.'s Mot. Dismiss at 10], but the Sixth Circuit has been clear, having stated—in a published opinion—that "the alien *must* satisfy all three prongs" of § 1326(d), *Estrada*, 876 F.3d at 887 (emphasis added).

due process violation caused him to suffer prejudice. *Estrada*, 876 F.3d at 887. Under the first element, he "must establish that [he] has been deprived of a life, liberty, or property interest sufficient to trigger the protection of the Due Process Clause in the first place." *Id.* (quotation omitted). Under the second element, he must make a "specific" showing of prejudice. *Shqutaj v. Gonzalez*, 158 F. App'x 663, 667 (6th Cir. 2005) (citation omitted); *Castellano-Chacon v. INS*, 341 F.3d 533, 553 (6th Cir. 2003), *abrogated on other grounds by Almuhtaseb v. Gonzales*, 453 F.3d 743 (6th Cir. 2006).

### 1. Voluntary Departure

In contending that a due process violation blighted Mr. Silvestre-Gregorio's removal hearing, FDS asserts that Mr. Silvestre-Gregorio "was deprived of a fundamentally fair hearing because the [immigration judge] failed to explain voluntary departure to him." [Def.'s Post-Hr'g. Mem. at 10]. According to FDS, the immigration judge's failure to explain voluntary departure resulted in a "unilateral denial of this form of relief" and expropriated him of his right to a liberty interest under the Due Process Clause. [*Id.*]. As support for this argument, it highlights the language in 8 C.F.R. § 1240.11(a)(2), which provides that "[t]he immigration judge shall inform the alien of his or her apparent eligibility to apply for any of the benefits enumerated in this chapter[.]" [Def.'s Mot. Dismiss at 7 (quoting 8 C.F.R. § 1240.11(a)(2))]. FDS maintains that Mr. Silvestre-Gregorio could "very well have been granted voluntary departure" during the removal hearing because he "met all" the requirements. [Def.'s Post-Hr'g Mem. at 11–12]. The United States, however, contends that he would not have qualified for voluntary departure because he did not have the means to pay for his departure, [United States' Suppl. Resp. at 3], though FDS counters the United States' position by arguing that he could have raised funds

through charitable organizations if only the immigration judge had explained voluntary departure to him, [Def.'s Post-Hr'g Mem. at 13].

A "discretionary form of relief," voluntary departure allows certain aliens "to leave the country willingly" and avoid the legal consequences of a removal order. *Dada v. Mukasey*, 554 U.S. 1, 9 (2008). An alien may apply for voluntary departure either before the conclusion of a removal hearing or at the conclusion of a removal hearing. *Id.*; *compare* 8 C.F.R. § 1240.26(b) (allowing for voluntary departure "[p]rior to completion of removal proceedings"), *with* 8 U.S.C. § 1229c(b) (permitting voluntary departure "[a]t the conclusion of proceedings"). These two forms of voluntary departure are known as "pre-conclusion" and "post-conclusion" voluntary departure, respectively.

The Court begins its analysis by emphasizing that an alien cannot satisfy 1326(d)'s element of fundamental unfairness without a showing of a due process violation. *Estrada*, 876 F.3d at 887 (stating that an alien who raises a collateral attack under § 1326(d) "must establish that [he] has been deprived of a life, liberty, or property interest sufficient to trigger the protection of the Due Process Clause in the first place" (quotation omitted)). In this vein, "[a] '[s]ubstantive due process' analysis must begin with a careful description of the asserted right." *Reno*, 507 U.S. at 302 (quotation omitted). FDS concedes, as it must, that voluntary departure is a discretionary form of relief, [Def.'s Mot. Dismiss at 2], and in this circuit, the law is well-settled: an alien has no constitutional right in obtaining relief from removal when the type of relief he seeks is discretionary in nature. *See Huicochea-Gomez*, 237 F.3d at 700 ("The failure to be granted discretionary relief does not amount to a deprivation of a liberty interest." (citation omitted)); *Ashki v. INS*, 233 F.3d 913, 921 (6th Cir. 2000) ("[An alien] has no constitutionally-protected liberty interest in obtaining discretionary relief from deportation.").

But FDS describes the "asserted right" at interest not as Mr. Silvestre Gregorio's right to *obtain* voluntary departure but as his right to *be advised* of voluntary departure by the immigration judge. *See* [Def.'s Suppl. Mem. at 2 (contending that Mr. Silvestre-Gregorio "was not *advised* of relief rather than that he was wrongfully not given a discretionary grant of relief")]. While this argument is shrewd, it is not novel—this Court has already rejected this identical argument in a previous case. In *United States v. Barba*, No. 3:08-CR-46, 2009 WL 1586793 (E.D. Tenn. June 3, 2009), the defendant, whom the United States charged with illegal reentry, collaterally attacked an immigration judge's removal order under § 1326(d). In raising this attack, he argued that he had a constitutionally guaranteed right of "*being advised* that one might possibly attain discretionary relief," namely the right to "have been advised of the possibility . . . to voluntarily depart." *Id.* at *9, 10. This Court held that "a defendant does not have a constitutionally protected interest in being advised that such an 'act of grace' could, possibly, be bestowed upon him." *Id.* at *10 (quotation omitted).

Several circuit courts, including the Sixth Circuit, have reached the same or similar conclusion. *See Shqutaj*, 158 F. App'x at 667 ("[Appellant] cites no authority to support his theory that failure to properly advise an alien of the consequences of taking voluntary departure rises to the level of a denial of due process. Our own research failed to uncover a single case that supports such a claim."); *see also Richardson*, 558 F.3d at 224 ("[T]here is no due process right to be informed of the possibility of discretionary relief," and therefore "a failure to inform does not render a deportation proceeding fundamentally unfair." (citation and footnote omitted)); *United States v. Pallares-Galan*, 359 F.3d 1088, 1096 (9th Cir. 2004) (recognizing that a duty to advise an alien of potential relief from deportation exists only "[w]here 'the record contains an inference that the petitioner is eligible for relief from deportation'" (quotation omitted)).

And importantly, the regulatory language that Mr. Silvestre-Gregorio relies on in 8 C.F.R. § 1240.11(a)(2) states only that "[t]he immigration judge shall inform the alien of his or her *apparent* eligibility to apply for any of the benefits enumerated in this chapter[.]" (emphasis added). When a regulation like this one requires an immigration judge to advise an alien of potential relief only if his right to that relief is apparent, the Sixth Circuit has declined to find that the alien has suffered prejudice—or at a minimum, harm that is akin to prejudice—unless he "demonstrate[s] 'his apparent eligibility' for such relief."

> [I]t is apparent from an examination of the relevant regulation and the applicable case authorities that no duty exists to inform an alien of other theoretical statutory bases for relief from deportation; rather, the regulation merely requires such disclosure only where the respondent demonstrates 'his apparent eligibility' for such relief. . . . [The appellant] has not advanced here or below any basis upon which he could be viewed as apparently eligible for relief from deportation.

*Ghaelian v. INS*, 717 F.2d 950, 953 (6th Cir. 1983) (citations omitted); *see United States v. Rodriguez-Flores*, No. 5:13-CR-75-KKC, 2014 WL 1744860, at *2 (E.D. Ky. May 1, 2014) (relying on *Ghaelian* to reject an alien's collateral attack of his removal hearing and his motion to dismiss the indictment). Even if FDS could show that Mr. Silvestre-Gregorio had a due process right to be advised of voluntary departure, his collateral attack would still falter because FDS does not demonstrate that he was apparently eligible for pre-conclusion or post-conclusion voluntary departure in 2001.

### i. Pre-Conclusion Voluntary Departure

An alien who requests voluntary departure before the conclusion of a removal hearing will be eligible for pre-conclusion voluntary departure if he:

> (A) Makes such request prior to or at the master calendar hearing at which the case is initially calendared for a merits hearing;

(B) Makes no additional requests for relief (or if such requests have been made, such requests are withdrawn prior to any grant of voluntary departure pursuant to this section);

(C) Concedes removability;

(D) Waives appeal of all issues; and

(E) Has not been convicted of a crime described in section 101(a)(43) of the Act and is not deportable under section 237(a)(4).

8 C.F.R. § 1240.26(b)(1)(i)(A)–(E). In contending that Mr. Silvestre-Gregorio was apparently eligible for pre-conclusion voluntary departure, FDS maintains that he "met all of" these requirements. [Def.'s Post-Hr'g Mem. at 12].

But as to the first requirement, FDS acknowledges that Mr. Silvestre-Gregorio did not request voluntary departure. [*Id.*]. Similarly, although Mr. Silvestre-Gregorio, at the end of the removal hearing, expressed a desire to return to Mexico, [Audio: Removal Hr'g at 31:15–20], FDS cites no evidence establishing that he actually conceded his removability; instead, he participated in the removal hearing from start to finish, *see Alvarado v. U.S. Attorney Gen.*, 610 F.3d 1311, 1315 (11th Cir. 2010) (recognizing that pre-conclusion voluntary departure "allows an alien charged with removability to depart the country voluntarily, at his own expense, instead of going through removability proceedings, or *prior to the completion* of removability proceedings" (citation and footnote omitted)); *see also Camick v. Sessions*, 891 F.3d 1101, 1104, 1108 (8th Cir. 2018) (noting that an alien entered into an agreed pre-conclusion order). Indeed, his hearing concluded with an order of removal, not an order of voluntary departure that the parties arrived at through any concession on Mr. Silvestre-Gregorio's part. And just as problematical, even if Mr. Silvestre-Gregorio did concede removability to Mexico, FDS looks past the fact that Guatemala—not Mexico—is his country of origin. The Court is loath to accept

the argument that an alien can lawfully concede removability to any country of his choice by lying to the immigration court. Lastly, FDS argues that Mr. Silvestre-Gregorio meets the fourth requirement under § 1240.26(b)(1) because he "waived appeal," [Def.'s Post-Hr'g Mem. at 12], but FDS has simultaneously—and strenuously—argued throughout this case that, based on an inability to understand the interpreter, "his waiver was not made voluntarily, knowingly, or intelligently," [*id.* at 4]. These two arguments cannot coexist. Mr. Silvestre-Gregorio simply has not "demonstrate[d] 'his apparent eligibility' for" pre-conclusion voluntary departure, either before this Court or the immigration court. *Ghaelian*, 717 F.2d at 953.

### ii. Post-Conclusion Voluntary Departure

An alien who requests voluntary departure at the conclusion of a removal hearing must satisfy additional requirements. The Attorney General *may* permit an alien to voluntarily depart the United States at his own expense if the immigration judge finds:

> (A) the alien has been physically present in the United States for a period of at least one year immediately preceding the date the notice to appear was served under section 1229(a) of this title;

> (B) the alien is, and has been, a person of good moral character for at least 5 years immediately preceding the alien's application for voluntary departure;

> (C) the alien is not deportable under section 1227(a)(2)(A)(iii) or section 1227(a)(4) of this title; and

> (D) the alien has established by clear and convincing evidence that the alien has the means to depart the United States and intends to do so.

8 U.S.C. § 1229c(b)(1); *see Perez-Roblero v. Holder*, 431 F. App'x 461, 469–70 (6th Cir. 2011) ("Even if an alien meets those requirements [under § 1229c(b)(1)], an immigration judge may deny voluntary departure." (8 U.S.C. § 1229c(a)(1))).

The record does not contain so much as an inference—let alone a preponderance of the evidence—to fortify an argument that Mr. Silvestre-Gregorio was apparently eligible for post-conclusion voluntary departure in 2001. Again, any chance an alien has to post-conclusion voluntary departure is conditional on his "physical[] presen[ce] in the United States for a period at least one year immediately preceding the date the notice to appear was served." 8 U.S.C. § 1229c(b)(1)(A). Mr. Silvestre-Gregorio entered the United States in February 2001. [Arrest Warrant at 3].[12] His notice to appear shows a date of service of February 2001. [Notice to Appear at 2]. He plainly had not been physically present in the United States for at least one year before receiving this notice, and FDS does not and cannot realistically argue otherwise. [Hr'g Tr. at 158:19–20 (observing that Mr. Silvestre-Gregorio was present in the United States for only "a few weeks" in 2001)]. Mr. Silvestre-Gregorio was therefore not apparently eligible for post-conclusion voluntary departure in 2001. *See Miculi v. Ashcroft*, 96 F. App'x 338, 340 (6th Cir. 2004) ("[The petitioner] was not eligible for voluntary departure, because she was placed in removal proceedings before she had been in the country one year."). In maintaining that the immigration judge failed to advise Mr. Silvestre-Gregorio of his right to voluntary departure, FDS is well short of demonstrating by a preponderance of the evidence that (1) a due process violation occurred during his removal hearing and (2) this due process violation caused him to suffer prejudice. *Estrada*, 876 F.3d at 887.

---

[12] Mr. Silvestre-Gregorio testified that he had never before entered the United States until February 2001. [Hr'g Tr. at 110:1–9].

### 2. *A Fair Opportunity to Be Heard*

Next, FDS argues that Mr. Silvestre-Gregorio's removal hearing was "fundamentally unfair because he did not understand the proceedings." [Def.'s Post-Hr'g Mem. at 5]. To support this argument, it underscores his "long pauses" and "nervous, doubtful answer[s]" during the removal hearing, claiming that they were indicative of his "lack of understanding" of the proceedings. [*Id.* at 2]. In addition, it stresses Ms. Jácome's conviction that the interpreter spoke in a high register, used false cognates, and translated the immigration judge's words at an inordinately fast rate—so fast that she had to listen to the recording twice. [*Id.* at 6]. Relying on this testimony, FDS cites Ms. Jácome's opinion that Mr. Silvestre-Gregorio understood about thirty percent of the removal hearing and that even a Latin American college graduate who lacked familiarity with the legal system would not understand most of it. [*Id.*].

Although the United States admits that "there where [sic] a few moments of hesitation by the defendant" during his removal hearing, it emphasizes that the immigration judge "asked the defendant if he was able to understand the interpreter," that "the defendant agreed he understood," that he "never stated that he did not understand" at any moment throughout the hearing, and that he "provided full answers in Spanish, not Chuj." [United States' Post-Hr'g Mem. at 5]. As to Ms. Jácome's opinion that only a lawyer would have understood the removal proceedings, the United States contends—persuasively—that "if this were true, we would have to disregard every case and interpretation that has ever been conducted, which is simply impractical." [*Id.* at 4]. Because of this impracticality, the United States urges the Court place more stock in Mr. Stempien's testimony, noting that Mr. Stempien is bilingual and "had he felt there was an issue with misunderstanding or misinterpretation he would have told the immigration judge." [*Id.* at 5].

The Court begins its analysis by reiterating that a showing of fundamental unfairness under § 1326(d) requires an alien to "establish that [he] has been deprived of a life, liberty, or property interest sufficient to trigger the protection of the Due Process Clause in the first place." *Estrada*, 876 F.3d at 887 (quotation omitted). Again, an alien suffers a deprivation of a liberty interest if the government does not provide him with (1) fair notice of charges against him, (2) a hearing, and (3) a fair opportunity to be heard at that hearing. *Dimaya*, 138 S. Ct. at 1231 n.3; *The Japanese Immigrant Case*, 189 U.S. at 101. In short, "[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews,* 424 U.S. at 333 (quotation and citation omitted).

FDS's argument that Mr. Silvestre-Gregorio was unable to understand the removal proceedings—or more specifically, the interpreter—unquestionably implicates his due process right, as an alien who was subject to removal proceedings, to an opportunity to be heard meaningfully. *See Amadou v. INS*, 226 F.3d 724, 728 (6th Cir. 2000) ("[W]here the capability of the interpreter is in question, an alien is denied his due process right to a full and fair hearing when he is ordered deported[.]"); *Nazarova v. INS*, 171 F.3d 478, 484 (7th Cir. 1999) ("A non-English-speaking alien has a due process right to an interpreter at her deportation hearing because, absent an interpreter, a non-English speaker's ability to participate in the hearing and her due process right to a meaningful opportunity to be heard are essentially meaningless." (citation omitted)); *Marincas v. Lewis*, 92 F.3d 195, 204 (3d Cir. 1996) (stating that "[c]ourts have recognized the importance of a competent translator to ensure the fairness of proceedings to applicants who do not speak English" (citations omitted)).

But FDS's blanket contention that Mr. Silvestre-Gregorio "did not understand the proceedings" is too broad when the Court considers his testimony that he *did* in fact understand the purpose of the proceedings:

> Q: So you were hoping that if you were going to be deported, it would be to Mexico?
>
> A: Yes, that was my hope[.]
>
> Q: Did you understand that you were in this hearing because they were trying to deport you?
>
> A: Mm-hmm.

[Hr'g Tr. 94:12–18].[13] The Court's focus cannot be so expansive as to cover an aerial view of the removal proceedings a whole; it has to be narrower, centering on whether the record shows, by a preponderance of the evidence, that Mr. Silvestre-Gregorio did not understand aspects of the removal hearing that were—at the very least—*relevant* to the immigration judge's entry of the removal order. *See Fall v. Gonzales*, 218 F. App'x 385, 389 (6th Cir. 2007) ("[W]here there was any confusion vis-a-vis the interpreter, it concerned testimony that was not critical or even relevant to the [immigration judge's] ultimate determination." (citing *Amadou*, 226 F.3d at 727)); *see Amadou*, 226 F.3d at 727 (labeling "the interpreter's faulty translation" as "directly prejudic[ial]" to the alien because the immigration judge depended on it in denying the alien's requested relief).

In this vein, FDS identifies three faulty translations that occurred during the removal hearing and that, in their view, affected Mr. Silvestre-Gregorio's opportunity to be meaningfully

---

[13] Although Mr. Silvestre-Gregorio later appeared to recant this testimony by stating that he "didn't understand at all" the removal proceedings, [Hr'g Tr. at 103:14], the Court notes that "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985) (citations omitted); *see United States v. Copeland*, 376 F.3d 61, 73 (2d Cir. 2004) (describing a collateral attack under § 1326(d)(3) as "somewhat akin to a trial within a trial").

heard at the hearing: the translations relating to (1) his right to an attorney, (2) his right to potential relief—presumably voluntary departure, which is the only type of relief that FDS has raised as a potential type of relief in this case—and (3) his right to appeal. [Def.'s Suppl. Mem. at 9]. Having already determined that Mr. Silvestre-Gregorio did not have a due process right to receive an explanation of voluntary departure as a form of potential relief, the Court will limit its analysis to Mr. Silvestre-Gregorio's arguments concerning his right to an attorney and his right to appeal.

### i. Right to an Attorney

Although Ms. Jácome testified generally that Mr. Silvestre-Gregorio did not understand thirty percent of the removal hearing, she did testify that she believed he specifically did not understand his right to have time to consult an attorney because "he never gave an answer to that particular question." [Hr'g Tr. at 77:20–21]. The United States, however, points the Court to evidence countering her opinion, including Mr. Silvestre-Gregorio's admission during the removal hearing that he did understand the interpreter, and his ability to process and answer the interpreter's open-ended questions—despite the fast rate of speech. [United States' Post-Hr'g Mem. at 5]. In addition, the Court notes that Mr. Silvestre-Gregorio's daughter testified that he taught Spanish to her at an early age[14] and that Mr. Stempien testified he could not recall an instance in which a child misunderstand or miscommunicated with an interpreter during a removal hearing. When the Court weighs the testimony of all these witnesses, it easily adds up to a preponderance of evidence *against* Mr. Silvestre-Gregorio.

---

[14] Although Magdalena testified that her father's fluency "wasn't very great," [Hr'g Tr. at 138:4], the fact that he taught her to read and write Spanish before she entered kindergarten indicates that he understood the language at a time that was not far-removed from his 2001 hearing.

But ultimately, the Court has no need to determine whether the evidence demonstrates that he lacked a meaningful opportunity to be heard during the removal hearing—to the extent that an attorney's absence might have deprived him of that opportunity—because, under the law in this circuit, an alien has no due process right to counsel in removal proceedings:

> Unlike in criminal cases, the government has no role in appointing counsel in immigration hearings because the Due Process Clause does not guarantee a right to government-provided counsel in civil litigation. Removal proceedings are 'purely civil action[s]' . . . . The Fifth Amendment simply does not guarantee the right to counsel or, it follows, the right to effective counsel in removal proceedings.

*Al-Saka v. Sessions*, 904 F.3d 427, 434 (6th Cir. 2018) (citations and quotation omitted). FDS has, in fact, conceded this fatal point to their argument, recognizing that "currently there is no right to counsel at the expense of the government for minors in immigration court." [Def.'s Post-Hr'g Mem. at 13].[15]

Still, an immigration judge has a responsibility to ensure that an alien receives a fair removal hearing, and an immigration judge abdicates this responsibility if he "*knew* that the interpreter could not accurately translate the alien's testimony." *Al-Saka*, 904 F.3d at 434 (emphasis added) (citation omitted). FDS, though, does not go so far as to contend that the immigration judge actually knew that Mr. Silvestre-Gregorio was unable to understand the interpreter, and if anything, the immigration judge went to commendable lengths to preserve the removal hearing's integrity. He advised Mr. Silvestre-Gregorio of his rights, asked him if he understood his questions and the interpreter's translations, and did not proceed with the hearing until Mr. Silvestre-Gregorio responded with affirmative answers. FDS, however, does *suggest*

---

[15] While true that an immigration judge "shall not accept an admission of removability from an unrepresented respondent who is . . . under the age of 18 *and* is not accompanied by an attorney or legal representative, a near relative, legal guardian, or friend," the record is clear, and the parties do not dispute, that Mr. Stempien accompanied Mr. Silvestre-Gregorio at the removal hearing. 8 C.F.R. § 1240.10(c) (emphasis added); *see* [Notice of Appearance at 1].

that the immigration judge did not do enough to preserve the hearing's integrity, by observing that he "never asked [Mr. Silvestre-Gregorio] if he spoke Spanish or if he preferred a different language." [Def.'s Post-Hr'g Mem. at 2].[16]

But FDS overlooks the fact that Mr. Silvestre-Gregorio—by his own admission—*lied* both to federal officials of the INS and the immigration court by telling them he was a native of Mexico instead of Guatemala:

> Q: Why did you tell [the federal agents] that you were Mexican?
>
> A: Because there was so much violence in the place where I was from that I didn't want to go, want to ever go back there.
>
> Q: Do you mean Guatemala?
>
> A: Yes.
>
> Q: So you told a lie that you were, that you were born in Mexico?
>
> A: Yes, I lied. I swear, I did lie.

[Hr'g Tr. at 88:17–25]. Mr. Silvestre-Gregorio advanced this lie when he appeared before the immigration judge:

> Immigration Judge: Where were you born?
>
> Mr. Silvestre-Gregorio: In Chiapas.
>
> Immigration Judge: And that's in Mexico, is that correct?
>
> Mr. Silvestre-Gregorio: Yes.

[Audio: Removal Hr'g at 22:20–22:30].

---

[16] FDS, incidentally, also faults the immigration judge for using "Mr. Stempien [as] a witness *against* juvenile Silvestre-Gregorio," [Def.'s Post-Hr'g Mem. at 10], but an immigration judge has the authority and, in fact, an obligation to "administer oaths, receive evidence, and interrogate, examine, and cross-examine the alien and any witnesses," 8 U.S.C. § 1229a(b)(1).

Taking Mr. Silvestre-Gregorio—who was under oath at the time—at his word, the immigration judge would have been hard-pressed, particularly as Mr. Silvestre-Gregorio responded in Spanish to the interpreter's translations of open-ended questions, to deduce that he really needed an interpreter who, according to Ms. Jácome, spoke a dialect that is provincial to Northern Guatemala. [Hr'g Tr. at 25:2–5]. And the record simply contains no evidence that the immigration judge did deduce that Mr. Silvestre-Gregorio was a native of Guatemala and lacked the ability to understand Spanish—an argument that, again, FDS does not raise. In short, the record is without a preponderance of evidence from which the Court can conclude that the immigration judge contravened Mr. Silvestre-Gregorio's due process rights by ordering his removal despite all the while *knowing* he did not understand the interpreter. *See Al-Saka*, 904 F.3d at 434.

Lastly, although FDS acknowledges that "there is no right to counsel at the expense of the government for minors in immigration court," it entreats the Court to consider "that there is an evolving movement that children in immigration proceedings should be entitled to counsel provided by the government in order to satisfy due process." [Def.'s Post-Hr'g Mem. at 13]. It identifies the Ninth Circuit as the epicenter for this "evolving movement." *See Flores-Chavez v. Ashcroft*, 362 F.3d 1150, 1160 (9th Cir. 2004) ("[M]inors generally cannot appreciate or navigate the rules of or rights surrounding final proceedings that significantly impact their liberty interests." (citations omitted)); *see also C.J.L.G. v. Barr*, ___ F.3d ___, 2019 WL 1967943, at *14 (9th Cir. May 3, 2019) (Paez, J., concurring) ("[T]he risk of error in a removal proceeding where an unrepresented child is seeking relief is high. . . . The proceedings are lopsided because the government is represented.").

But a thumbnail assertion about unrepresented minors' inability to appreciate removal proceedings and a concurring opinion hardly amount to a groundswell within the judiciary, and besides, the Ninth Circuit has recognized that immigration regulations endow unrepresented minors with "special protections in removal proceedings." *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1037 (9th Cir. 2016); *see* 8 C.F.R. § 1240.10(c). And more importantly, the Supreme Court and the Sixth Circuit have rejected the view that minors are categorically too young to traverse the removal process on their own. *See Reno*, 507 U.S. at 309 (rebuffing an argument that alien minors were "too young or too ignorant" to assert or waive their right to a hearing); *Jimenez-Castro v. Sessions*, 750 F. App'x 406, 410 (6th Cir. 2018) (stating that "[t]he law has long recognized that '[m]inors can be responsible for their own legal status,'" whether by "waiv[ing] their constitutional rights to appeal deportation," "remain[ing] silent during a custodial interrogation," "hav[ing] a jury trial," or "appeal[ing] a conviction" (quotation and citation omitted)).

In any case, any showing of prejudice is absent from FDS's argument because, as to prejudice, FDS maintains that Mr. Silvestre-Gregorio, without an attorney's assistance, lacked legal advice that might have enhanced his understanding of voluntary departure:

> [T]he Court should take into consideration that there is an evolving movement that children in immigration proceedings should be entitled to counsel provided by the government in order to satisfy due process. Specifically, in the case of Mr. Silvestre-Gregorio, had he been appointed counsel, he might have been able to understand voluntary departure and how it could benefit him (among other things, it could not serve as a predicate removal for 8 USC § 1326).

[Def.'s Post-Hr'g Mem. at 13]. Again, the Court has already determined that he had no due process right to an explanation of voluntary departure, not only because it is discretionary relief but also because FDS failed to show he was apparently eligible for it. In sum, FDS has not

illustrated by a preponderance of the evidence that Mr. Silvestre-Gregorio, without an attorney present at his removal hearing, (1) lacked a meaningful opportunity to be heard, in violation of his due process rights, and (2) suffered prejudice as a result. *Estrada*, 876 F.3d at 887.

## ii.    Right to Appeal

In contending that Mr. Silvestre-Gregorio did not have a meaningful opportunity to be heard because he did not understand his right to appeal, FDS again relies on Ms. Jácome's testimony. FDS focuses on her testimony that the word "appeal" is a high-register, or seldom used, term in Spanish, and it claims her "opinion was that [Mr. Silvestre-Gregorio] did not understand his appeal rights." [Def.'s Post-Hr'g Mem. at 4]. In response, the United States maintains that the immigration judge "generally advis[ed]" Mr. Silvestre-Gregorio of his right to appeal the removal order and that Mr. Silvestre-Gregorio expressed his understanding of this right and his other rights. [United States' Post-Hrg Mem. at 3]. According to the United States, the Due Process Clause requires nothing more. [*Id.*].

The Court begins by acknowledging that the United States' characterization of the law is correct: an immigration judge comports with due process by generally advising an alien of his right to appeal a removal order. *See United States v. Escobar-Garcia*, 893 F.2d 124, 124, 126 (6th Cir. 1990) (holding that an immigration officer's statement, "[f]rom this decision you may appeal to the Board of Immigration Appeals," sufficed "to provide[] [an alien] with due process of notice of his appellate rights"); *see also United States v. Lopez-Solis*, 503 F. App'x 942, 946 (11th Cir. 2013) ("[T]he Sixth Circuit has held that . . . general explanations at the conclusion of a deportation hearing advising the alien of his right to appeal the deportation order . . . provide the alien with notice of his appellate rights sufficient to satisfy due process." (citing *Escobar-Garcia*, 893 F.2d at 126)). But in this case, neither party disputes that the

immigration judge did, at a minimum, generally advise Mr. Silvestre-Gregorio of his right to pursue an appeal of the removal order; instead, they dispute whether Mr. Silvestre-Gregorio had a sufficient understanding of the interpreter's use of the Spanish word "appeal."

In assessing whether the interpreter "capab[ly]" informed Mr. Silvestre-Gregorio of his right to appeal, *Amadou*, 226 F.3d at 728, the Court turns to Ms. Jácome's testimony and FDS's portrayal of it—which is neither complete nor entirely accurate. Ms. Jácome did indeed testify that the word "appeal" is high register in Spanish: "[T]he word 'appeal,'" she said, "is a very high level which is rarely heard in, in, in lay terms." [Hr'g Tr. at 23:14–15]. According to her testimony, an interpreter would therefore "have to . . . explain[] . . . what an appeal is." [*Id.* at 23:18–19]. But FDS looks past the fact that Ms. Jácome testified that the interpreter did in fact provide Mr. Silvestre-Gregorio with an explanation of an appeal: "The interpreter did explain briefly what an appeal is," Ms. Jácome said. [*Id.* at 24:22–23].

And not only that, but the immigration judge, when explaining Mr. Silvestre-Gregorio's right to appeal, did not uniformly use the word "appeal." Instead, he used lay terms and phrases like "higher court," "review," "any decision you don't like," and "to make sure there is no mistake." [Audio: Removal Hr'g at 9:15–35].[17] FDS ignores the immigration judge's use of these plain terms, and at no point does FDS or Ms. Jácome maintain that these plain terms are high register or that they in any way translate poorly from English to Spanish. Lastly, contrary to FDS's assertion otherwise, Ms. Jácome never testified that Mr. Silvestre-Gregorio did not understand his appellate rights; rather, she was unable to form an opinion on this issue:

> The Court: Do you have an opinion about whether or not this defendant understood his right to appeal?

---

[17] Later, at the end of the hearing, the immigration judge—using these same plain terms—reiterated Mr. Silvestre-Gregorio's right to appeal his removal order, one on one with Mr. Silvestre-Gregorio: "Do you want a higher court to review the order?" [Audio: Removal Hr'g at 31:00–11].

Ms. Jácome: I would not be able to give an answer to that. I do not know—there's no way for me to know whether he understood it or not.

[Hr'g Tr. at 76:16–20]. In short, FDS, with its reliance on Ms. Jácome's testimony, does not identify even a scintilla of evidence illustrating that Mr. Silvestre-Gregorio did not understand his right to appeal his removal order, let alone a preponderance of evidence.

And, as importantly, even if Mr. Silvestre-Gregorio did not understand his appellate rights, a showing of prejudice—or in other words, a showing that he would have actually prevailed on an appeal of his removal order—is necessary to establish fundamental unfairness. *See United States v. Ravelo-Rodriguez*, No. 3:11–CR–70, 2012 WL 1597396, at *5 (E.D. Tenn. Mar. 19, 2012) (recognizing that an "alien needs to prove that he might not have been deported had he been able to exercise his right of direct appeal" and must "show[] that the result might have been different" (quoting *United States v. Fernandez-Antonia*, 278 F.3d 150, 158 (2d Cir. 2002))); *see also United States v. Espinoza-Farlo*, 34 F.3d 469, 471 (7th Cir. 1994) ("[An alien] must show that he was prejudiced by the Immigration Judge's failure to inform him of his right[] to . . . appeal, because an informed exercise of those rights would have yielded him relief from deportation."); *cf. Sako v. Gonzalez*, 434 F.3d 857, 866 (6th Cir. 2006) ("An alien's lost opportunity to appeal an adverse decision in a removal proceeding, because of ineffective assistance of counsel, cannot form the basis of a due process claim unless the appeal itself would have succeeded.").

FDS, however, has not made any discernible argument that Mr. Silvestre-Gregorio, if he had understood his right to appeal, would have actually succeeded on appeal. Although it has expressed optimism that he could have qualified for voluntary departure, and presumably its optimism would carry over to an appeal, it has failed—for the reasons the Court has already

identified—to establish that he was apparently eligible at the time of the removal hearing for pre-conclusion or post-conclusion voluntary departure. In sum, FDS has not established that Mr. Silvestre-Gregorio's removal hearing was fundamentally unfair, having failed to show, by a preponderance of the evidence, that Mr. Silvestre-Gregorio (1) lacked a meaningful opportunity to be heard, in violation of his due process rights, and (2) experienced prejudice as a result. *Estrada*, 876 F.3d at 887.

## IV. CONCLUSION

As the movant to dismiss the United States' indictment, Mr. Silvestre-Gregorio fails to meet his burden of establishing by a preponderance of the evidence that his underlying removal hearing was fundamentally unfair under § 1326(d). The Court therefore **ORDERS** as follows:

1. Defendant's Motion to Dismiss, or Alternatively to Release Defendant on Pretrial Conditions of Release Pending a Final Decision [Doc. 20] is **DENIED**.

2. The United States' Motion for Extension Nunc Pro Tunc [Doc. 34] is **DENIED as moot**.

So ordered.

ENTER:

_____
s/J. RONNIE GREER
UNITED STATES DISTRICT JUDGE